**INTERNATIONAL ASSOCIATION OF FIRE FIGHTERS, LOCAL UNION NO. 42, Appellant,**

**v.**

**JACKSON COUNTY, Missouri, Respondent.**

**WD 79563**

Missouri Court of Appeals, Western District.

Filed: August 15, 2017.

Scott L. Brown, Kansas City, KS for appellant.

Whitney S. Miller, Kansas City, MO for respondent.

Before Division Three: Alok Ahuja, P.J., and James E. Welsh and Edward R. Ardini, Jr., JJ.

Alok Ahuja, Judge

Bryan Krantz served as an Assistant Prosecuting Attorney in the Jackson County Prosecuting Attorney's Office from 1984 until his employment was terminated in August 2011. Krantz was a member of Local 42 of the International Association of Fire Fighters, and his employment was governed by a collective bargaining agreement. Krantz's union representatives filed a grievance challenging his termination. Following an evidentiary hearing, an arbitrator vacated Krantz's discharge, and ordered that he receive a written reprimand instead.

The Jackson County Prosecutor and Jackson County Executive exercised their joint authority under the collective bargaining agreement to review the arbitrator's decision. They issued a joint decision modifying the arbitration award, and reinstating Krantz's discharge. Local 42 filed suit in the Circuit Court of Jackson County, contending that the County's modification of the arbitration award breached the collective bargaining agreement. The circuit court granted summary judgment to the County, upholding management's decision to terminate Krantz's employment.

Local 42 appeals. We affirm.

**Factual Background**

Krantz served as an assistant prosecutor in the Prosecuting Attorney's Office from 1984 until his termination in August 2011. At the time of his discharge, Krantz was a senior trial attorney. He was terminated by Jean Peters Baker, who was appointed Prosecuting Attorney in May 2011.

Krantz's termination arose out of his conduct as lead trial counsel in *State of Missouri v. Mauricio Lopez*, No. 0916-CR0111-03, filed in the Circuit Court of Jackson County. The *Lopez* case was assigned to Judge Jack R. Grate. The defendant in *Lopez* was charged with second-degree murder and armed criminal action. The case was originally filed in March 2009, but was dismissed and re-filed by Krantz on September 13, 2010, the day the case was set for trial.

Krantz and defense counsel in the *Lopez* case (Pat Peters) had ongoing disputes concerning the adequacy of the State's disclosure of information in discovery. On December 9, 2010, Judge Grate entered a "Discovery Order" directing the State to provide all discovery requested by the defense within 20 days. Krantz responded on December 29 by providing a packet of material which he asserted complied with

the Discovery Order. Peters disagreed that the State had discharged its obligations under the December 9 order and the discovery rules.

On March 24, 2011, with the case set for trial on August 8, 2011, Judge Grate entered a further order in an attempt to resolve the pending discovery disputes. The March 24, 2011 order provided that defense counsel

> shall provide the State with a comprehensive list of all discovery that Defendant alleges it has not been provided. The State shall respond to that list and identify which of the documents have in fact been provided, when, and with enough information to identify the document. This will narrow the issues for the Court to take up.

The circuit court's March 24 order was unusual: Krantz testified at the arbitration hearing that he had never previously been involved in a case in which the court ordered a defendant to provide a detailed list of requested discovery materials, and gave the prosecution a date certain by which to respond.

On May 31, 2011, defense counsel Peters sent Krantz a ten-page letter which included a detailed list of the items to which the defense claimed they were entitled, but which had not yet been disclosed by the State (the "Discovery Letter").

A discovery hearing was scheduled on June 3, 2011. That morning, Krantz's "second chair" in *Lopez*, Assistant Prosecuting Attorney Devin Ledom, filed an application for continuance of the hearing. The sole basis for a continuance stated in the application was that "[t]he State received the letter from defense counsel detailing the discovery deficiencies alleged on May 31st, and the State has not had ample time to analyze the list and prepare a response." The continuance application was signed by Ledom on Krantz's behalf. Le-

dom later explained that the decision to file the application for continuance, in response to the Discovery Letter, was made solely by Krantz, and that Ledom "did not have any personal knowledge of the letter or list referred to in ... the Application and included this information at the direction of Bryan Krantz." Ledom also stated that he "would not have included any information about the May 31st letter [in the application] had I had [*sic*] not been directed by Bryan Krantz to do so." Krantz acknowledged at the arbitration hearing that he had directed Ledom to file the continuance application.

In response to the State's continuance motion, the court reset the discovery hearing for July 19, 2011, less than three weeks before the August 8 trial date. Krantz testified at the arbitration proceeding that, when he arrived at the July 19 hearing, he believed that the hearing was intended to address only Lopez's unrelated traffic tickets, and potentially for the taking of a guilty plea in the murder case. Krantz testified that he understood that, if no guilty plea was made and accepted at the July 19 hearing, the pending discovery issues would be set for hearing at a later date. Krantz acknowledged that he was unprepared to address the suppression and discovery issues which the circuit court actually addressed at the July 19 hearing.

After the parties entered their appearances, Judge Grate began the July 19 hearing by explaining that,

> What we have pending today is everything. In case anybody was unclear about that we had everything that was pending set on March 24th, if not earlier, and on that date it was continued to May 12th, and on that date it was continued to June 3rd, and on that date it was continued to 7/19. It is clear to me from the tenor of these orders that what

is set is everything and because we have got our trial date.

The court then recounted the case's procedural history in detail, highlighting the pending motions. At the conclusion of this recitation, Judge Grate asked the parties: "[n]ow, if somebody has got a different idea about what all is pending, speak up. I went through the file with some care." Krantz said nothing. He did not take issue with the court's description of the scope of the hearing, or indicate that he was unprepared to proceed.

As the circuit court reviewed the status of discovery, a lengthy colloquy occurred concerning the Discovery Letter, and whether Krantz had seen and responded to it. Because Krantz's statements during this exchange became a primary basis for his discharge, we quote from the July 19, 2011 transcript at length:

> The Court: Have you given the state a comprehensive list what you thought were the shortcomings in their discovery?
>
> Mr. Peters: Yes. We had talked previously that I had filed a pleading back in February that detailed things, and it falls into two categories. Things that the state listed as exhibits they intended to introduce which I have not been provided, and things that I had requested that I have not been provided after we came to court. And the Court corrected me on going with what I had done in February wasn't sufficient. I sent a letter to Brian restating the items that we had talked about and then mentioning the things that we've discussed over and over having to do with documents in evidence such as subpoenas, motions, orders for writs, letters, e-mails, handwritten notes, etcetera.
>
> The Court: Mr. Krantz, as far as that goes, did you then respond?

> Mr. Krantz: The last I recall we were in chambers and Mr. Peters said he was dropping the motion. *Do you have a copy of the letter because I don't have it in my file.*
>
> The Court: He said he was going to drop it, and then we came out in open court and he said he wasn't, after he consulted with his client and his partner.
>
> Mr. Krantz: *I don't have a copy of this. Judge, I don't have a copy of this.* Let's cut to the chase. Mr. Peters and I have an ongoing dispute about the state's obligations in discovery. We follow the Supreme Court rules.
>
> The Court: But you followed my order.
>
> Mr. Krantz: Pardon me?
>
> The Court: I solved all of this and told you what to do.
>
> Mr. Krantz: All right. Okay.
>
> The Court: Don't you think? Here is what I told you to do, respond to his list. Now I said that on March 24th, and *if you never got a letter from him giving you the list. Did you ever contact him and say, where is your stupid list that I need to respond to?*
>
> Mr. Krantz: *No sir, I did not.*
>
> Mr. Peters: Judge, it may be because we have multiple attorneys. But in Mr. Ledom's—well, actually it's Mr. Krantz's application for continuance from our last hearing date, he states, "The state received the letter from defense counsel detailing the discovery deficiencies alleged on May 31st"—which is the date of my letter—"and the state has not had ample time to analyze the list and prepare a response."
>
> The Court: What date is that?
>
> Mr. Peters: I don't know what date it was filed. I received it by fax on June 2nd of 2011.

The Court: I show it filed in on June 3rd, but I think we're talking about the same thing. *Mr. Krantz, that kind of belies the idea that you didn't know you were supposed to do it.*

Mr. Krantz: *Yes. Mr. Ledom did sign that letter. I had not seen this.*

The Court: I was hoping that everybody looked at their file before they're sitting here with me today. We have got a God dang murder trial coming up and it looks like nobody has got the file completely reviewed.

Mr. Krantz: Your Honor, our state's response, "We endorse the witnesses. All of their statements have been provided."

The Court: I asked you to respond to his letter.

Mr. Krantz: Right.

The Court: And you didn't, correct?

Mr. Krantz: Well, I think our state's response does respond to the letter.

The Court: No, it doesn't. I said I'm going to get to the bottom of this. I can't tell—you know whats going to happen in trial, you're going to try to offer an exhibit. He's going to say he never got it. All right. How am I ever going to get to the bottom of that. So I told Mr. Peters get him a detailed list of what all you think that you're missing. Mr. Krantz will respond. Then, when I get an offer of an exhibit and an objection, you'll be able to open right up, with Mr. Ledom's help, to a response that you gave to him. And say, Judge, he has had it for nine months, plus I know he just got it again because here is how I complied with your order.

Mr. Krantz: Your Honor, on December 29th, we filed a—

The Court: I got that.

Mr. Krantz: Okay.

The Court: That didn't solve anything. I wanted something new or I wouldn't have ordered it.

Mr. Krantz: Well, this certifies everything that we've given him.

The Court: All right, then that's all your going to be able to offer. Only what in that package is the only things that are going to be admissible in evidence in this trial. Mr. Peters, so you're getting your way, and I'm going to sustain your motion. The December 29th package that purports to be the discovery order—make a note please—discovery disclosures. It is those documents and only those documents because of the state's failure to respond by the letter, like I said.

Mr. Krantz, I don't appreciate the fact this couldn't be clear to you. I made great pains to be clear that I thought we had a cluster going on. And I was never going to be able to get to the bottom of who provided what to who. So he was supposed to give you a list. You were supposed to respond. I was going to take 48 hours of my valuable time, over nine days if necessary, to go through each damn item to figure out what had been disclosed and what had not, and you didn't comply with this.

So the December 29th, 2010, disclosures that were made by the state shall be the documents and the disclosures that the state is allowed to use as evidence, and that will be my yardstick when a document or witness is offered into evidence by the state and the defense objects.

So got that solved and I know it's not to the state's liking, but I don't know what else to do with it. I bent over backwards to get to the bottom of this.

In connection with the defense's motion to suppress Lopez's post-arrest statements, the State needed the testimony of

Detective Ken Royster from the Independence Police Department, who had conducted Lopez's interrogation. Detective Royster had not been previously notified of the July 19 hearing. When it became apparent that the suppression motion would be addressed, Krantz directed Ledom to call Detective Royster and summon him to the hearing. Detective Royster was not briefed or prepared for the hearing, and repeatedly stated during his examination that he could not recall details of the *Lopez* case. The circuit court denied the suppression motion at the July 19 hearing.

The circuit court entered a written "Ruling on Motions" in the *Lopez* case on July 25, 2011, which memorialized the rulings the court had made from the bench at the July 19 hearing. The order observed that "[t]his case has been riddled with unnecessary discovery issues." The court then recounted the history of its efforts to resolve these issues. The court noted that its December 9, 2010 order "provided a roadmap to the State of what was required," but that "[t]he State has not complied with that Order in several respects." The court then turned to its March 24, 2011 order.

> It is clear the Defendant complied with the 03/24/2011 Order and that the State did not. Even after all this controversy, the State did not do as directed by the Court.

> The Court has repeatedly directed the State to make more complete discovery and in great detail. The State has declined. Other than the statement to Det. Royster, all statements of co-defendants and the Defendant are excluded for non-disclosure during discovery, and more importantly, the statements are excluded for failure to follow the reasonable directives of this Court repeatedly.

> The issue here is not precisely what Rule 25.03 generally requires, nor is it whether the disclosures made in this

case might be generally acceptable. The issue is fairness. The Defendant has repeatedly sought greater detail than the State is accustomed to providing. Discovery was ordered by the Court and the State did not comply.

On July 21, 2011, two days after the July 19 hearing, Chief Trial Attorney Tammy Dickinson and Trial Team Leader Traci Stansell received a complaint from the Independence Police Department concerning Krantz's treatment of Detective Royster at the *Lopez* hearing. Detective Royster complained that he was called to testify at the hearing without any forewarning or preparation, and that he was embarrassed by his performance. Additionally, the victim's family had complained to the Police Department about its handling of the *Lopez* prosecution, based on what had transpired during the July 19 hearing.

After receiving the Independence Police Department's complaint, the Prosecutor's Office began an investigation into Krantz's conduct in *Lopez*. Among other things, Dickinson and Stansell met with Judge Grate, who told them that Krantz was "totally un-prepared" for the July 19 hearing, and that Krantz "denied ever getting the [Discovery Letter] and, as a result, had never responded to it." Judge Grate told Dickinson and Stansell that Krantz had "repeatedly resisted [the Judge's] order to turn over the statements" of co-defendants, and that Krantz's refusal to comply with discovery orders resulted in suppression of State's witnesses and exhibits. Judge Grate stated that Krantz's conduct during the July 19 hearing "was embarrassing and disgraceful ... 'a disgraceful display of lawyering.'"

On July 26, the Prosecutor's Office learned that several witnesses in the *Lopez* case had not been notified of the upcoming trial date, even though it was just two

weeks away. At least one witness had plans to be out of town during trial.

Krantz met with Dickinson and Stansell on July 27 to discuss the *Lopez* case and the investigation into his conduct. Krantz was accompanied by Union Business Agent Michael LaCapra, who took notes of the meeting. LaCapra's notes include the following statement from Krantz:

I received a notice from the court to appear with regards to Mauricio Lopez for four (4) traffic tickets. I was not aware it was a suppression hearing and nothing in the order mentioned the murder case or discovery issues. The court announced it was taking up outstanding discovery issues in the murder case. I was not aware of this prior to this hearing nor was I prepared to handle the discovery matters at this hearing. One of the outstanding discovery issues was a motion to suppress the Defendant's statement. I responded to the court that there was no basis to suppress the statement given in the motion. We contacted Detective Royster and asked him to appear in court.... I don't recall receiving the letter from Peters regarding the list.

At this point Dickinson asked, "did you have a continuance with regard to the [Discovery Letter]?" to which Krantz responded that he did not recall, as he did not remember the Discovery Letter. Dickinson also asked Krantz whether he had told the court that he had received the Discovery Letter, and needed a continuance on that basis. Although the continuance application had been a subject of discussion with Judge Grate just eight days earlier, Krantz responded "I don't know." Dickinson asked Krantz twice whether he had told Judge Grate that he had not received the Discovery Letter; on both occasions, Krantz responded that he did not remember the letter.

LaCapra's notes of the July 27 meeting also report that Krantz's calendar contained a notation on July 19, which stated: "pretrial conference regarding Lopez case *and* four (4) traffic tickets, with numbers only on the calendar." (Emphasis added.)

Krantz was provided with a Notice of Suspension at the conclusion of the July 27 meeting. Stansell audited Krantz's case files on July 28 and 29, and found the files involving multiple cases to be disorganized, outdated, and incomplete. On August 2, Dickinson sent a letter to Peters Baker with her findings on the Krantz investigation.

On August 3, 2011, the defendant in the *Lopez* case pled guilty to second-degree murder and armed criminal action, and received a total sentence of fifteen years' imprisonment. Dickinson testified at the arbitration hearing that, if not for Krantz's misconduct, "that case was valued at much more than 15 years," and she would not have authorized a plea agreement giving the defendant a 15-year sentence.

On August 9, Krantz met with Peters Baker and other management attorneys and was given a final opportunity to justify his conduct. When Krantz could not provide justification, his employment with the Prosecutor's Office was terminated.

The Notice of Termination described the following reasons for Krantz's termination:

(1) Willful violation of a March 24, 2011 court order in *State v. Mauricio Lopez*, 0916-CR0111-03, by failing to file a response to defense counsel's letter regarding outstanding discovery issues. Such failure resulted in suppression of necessary evidence by the court.

(2) Willful violation of Missouri Supreme Court Rule 4-3.3, Candor Towards the Tribunal, by knowingly making a false statement of material fact and failing to correct the same. This

occurred on July 19, 2011 in Division 17 in State v. Mauricio Lopez, 0916-CR0111-03, at which time you represented to the court that you had not received the May 31, 2011 letter from defense counsel despite having stated that you had not had time to review the same in the June 3, 2011 Application for Continuance filed at your direction.

(3) Failure to comply with discovery obligations under Missouri Supreme Court Rule 25.03(A)(2) in State v. Mauricio Lopez, 0916-CR0111-03, by failing to timely notify defense counsel of written or recorded statements and substance of any oral statements made by a co-defendant, a list of all witnesses to the making, and a list of all witnesses to the acknowledgement, of such statements and the last known address of such witnesses. These statements are those made by a codefendant and witnesses at hearings and trial settings taking place prior to June 13, 2011. From a review of your other assigned trial cases after you were placed on leave on July 27, 2011 and your personnel file, there is a repeated pattern of your failing to file responses to motions, including responses to requests for discovery.

Following Krantz's termination, Local 42 filed a grievance on his behalf, asserting that Krantz's termination was not supported by "just cause," as required under the parties' Collective Bargaining Agreement. The matter ultimately progressed to arbitration, along with the grievances involving termination of two other Assistant Prosecuting Attorneys.[1] The parties selected Josef Rohlik, a retired professor from the St. Louis University School of Law, as arbitrator in all three cases. A hearing was held in Krantz's case on November 29, 2012.

At the arbitration hearing, Krantz admitted that he was unprepared for the July 19 hearing, testifying that he was "basically flying by the seat of [his] pants." Krantz testified that he "thought [the July 19 hearing] was going to be handling tickets and hopefully turn this thing into a guilty plea, and if not, we would set a date for the discovery hearing and whatever other matters needed to be addressed, and that's what [he] went to court for."

Krantz acknowledged at the arbitration hearing that he had, in fact, received the Discovery Letter before the July 19 hearing. Krantz testified that he must at least have glanced at the letter, since he asked Ledom to file a continuance request based on the letter. Nevertheless, Krantz maintained that he had forgotten receiving the letter by the time of the July 19 hearing.

Krantz denied that he ever told Judge Grate that he had not *received* the letter; instead, his responses were meant to indicate that he did not have the letter with him at the July 19 hearing. Krantz explained:

The Judge started and he started going through, we're going to go through this, this and this, and as he's doing that, I was grabbing the documents and trying to find the documents, the motions and responses and what not for those documents so I'd have them so I could—as they came up one by one, I could discuss them. So I'm pulling them out on counsel table before me and (the judge) is talking about the letter and *I said, I don't have the letter, something to the effect, you know, I don't have the letter here,* and I believe Mr. Ledom still had the letter, because it wasn't in the

1. One of the other dismissed attorneys was David Mitchell. We issued an opinion in Mitchell's case in *International Association of* *Firefighters, Local Union No. 42 v. Jackson County,* No. WD79785, 524 S.W.3d 217, 2017 WL 3253042 (filed Aug. 1, 2017).

file I had, and I don't think I'd seen the letter since I gave it to him to file a response.

(Emphasis added.) Krantz continued:

I was laying the stuff out and when he asked about the letter, I didn't have it and then they pointed out that there'd been a response filed, handed it to me, Mr. Ledom had filed the response, obviously at my direction, I had never seen his application for continuance.... [W]hen they were talking about the letter, before that *I'd said, I don't have it and I was talking about I didn't have it with me. I didn't have it in front of me* and I couldn't ever find it in the file I had.

(Emphasis added.)

Management had disciplined Krantz for discovery violations prior to 2011. Dickinson testified at the arbitration hearing that she had placed Krantz on a written Work Improvement Plan in 2008 for "discovery problems, not responding to discovery, not working his cases." Dickinson testified that the Work Improvement Plan was a form of discipline, and that Local 42's business agents viewed such plans in the same way, insisting that they be present if a Work Improvement Plan was to be imposed on an assistant prosecutor.

The arbitrator issued a decision finding that Jackson County lacked just cause to terminate Krantz's employment, and ordering that Krantz's termination be converted to a written reprimand. The arbitrator found that Krantz did violate his prosecutorial obligations by failing to timely respond to the Discovery Letter and by failing to provide requested discovery to the defense. The arbitrator concluded, however, that such misconduct had not been punished by termination in the past. Instead, the arbitrator found that, prior to Jean Peters Baker's appointment as Prosecuting Attorney, a "no discipline, 'any-

thing goes' atmosphere" prevailed in the Prosecutor's Office. Relying on federal caselaw and private sector arbitration decisions, the arbitrator concluded that,

if new rules, new totally different disciplinary concept is imposed it must be clearly communicated to the employees with some formality, usually in writing, to insure that all employees have been notified. The new rules must be clear, understandable, and absolutely must include discipline with some precision.

The arbitrator also concluded that the County was required to follow a system of progressive discipline with regard to Krantz's misconduct.

The arbitrator's decision is ambiguous concerning the veracity of Krantz's statements at the July 19 hearing concerning the Discovery Letter. At one point, the decision states that after reading the transcript of the July 19 hearing three times, "[i]t is obvious that Krantz equivocated"; "[h]owever, without the knowledge of the Judge and any instinct from the text, the arbitrator found no <u>offensive</u> statements or behavior by Krantz." Later, however, the arbitrator's decision interprets Krantz's statements at the July 19 hearing as a representation "that he did not have the Peters's [*sic*] letter"—thus rejecting Krantz's claim that he merely stated that he did not have the Discovery Letter *with him*. The arbitrator concluded that Krantz's representations concerning the letter were not truthful "under the legal concept of notice-knowledge," based on the fact that Krantz "had [the Discovery Letter] in his file," and had authorized Ledom to respond to the Discovery Letter and request a continuance of the June 3, 2011 hearing based on it. The decision states that, "[a]fter reading several times the transcript of the July 19 conference, the arbitrator concludes that the County failed to prove that Krantz ... did not forget

that he received the Peters letter and what it was about before being questioned about it." The arbitrator states that, with respect to the claim that Krantz made misrepresentations to the court, "this is a 50-50 case." The decision then states that "[t]he 'belie' term [used by Judge Grate at the July 19 hearing] means 'it cannot be believed,' nothing more or less." The arbitrator concludes his discussion of Krantz's representations by stating that his statements, even if untruthful, are "almost trivial in comparison with the prosecutorial behavior in" the *State v. Buchli* case (which resulted in the dismissal of a murder prosecution based on repeated discovery violations by the Jackson County Prosecuting Attorney's Office).[2]

Peters Baker and County Executive Michael Sanders exercised their right under the collective bargaining agreement to review the arbitrator's decision. They issued a 57-page Modification of the Arbitrator's Decision and Joint Ruling on October 9, 2013, in which they reversed the arbitrator's decision and upheld Krantz's termination.

On November 12, 2013, Local 42 filed a claim for breach of contract in the Circuit Court of Jackson County, alleging that Peters Baker and Sanders violated the collective bargaining agreement by modifying the arbitrator's decision. The Circuit Court ultimately granted summary judgment to the County, and upheld the Modification, and Krantz's termination, as a valid exercise of the County's authority under the collective bargaining agreement.

Local 42 appeals.

## Standard of Review

Our description of the standard of review in the companion case involving an-

other assistant prosecutor is equally applicable here:

As a general proposition, " '[w]hether to grant summary judgment is an issue of law that this Court determines *de novo.*'" *Owners Ins. Co. v. Craig*, 514 S.W.3d 614, 616 (Mo. banc 2017) (citation omitted).

Article VI, § 3(C) of the collective bargaining agreement gives the Jackson County Prosecuting Attorney and County Executive the authority to jointly review, and to jointly modify, an arbitrator's decision. Section 3(C) provides in relevant part:

Decisions of the arbitrator are subject to review jointly by the Prosecutor and the County Executive, who may modify the arbitrator's decision only when the findings of fact and decision of the arbitrator are clearly contrary to the weight of the evidence, viewed in its entirety, together with the legitimate inferences which may be reasonably drawn from the evidence and in the light most favorable to the findings of fact and the decision of the arbitrator. .... The written ruling shall be subject to judicial review in the Circuit Court of Jackson County, at which time this court shall have the authority to overturn the ruling if it does not comply with this Article.

Our task in this appeal is to determine whether the Prosecuting Attorney and County Executive properly exercised the modification authority granted to them by Article VI, § 3(C) of the collective bargaining agreement. The parties do not dispute that we should decide this

2. The *Buchli* case was the subject of three opinions by this Court, in which the facts of the case are described in detail: *State v. Buchli*, 152 S.W.3d 289 (Mo. App. W.D. 2004); *Buchli v. State*, 242 S.W.3d 449, 456 (Mo. App. W.D. 2007); *State ex rel. Jackson Cnty. Prosecuting Att'y v. Prokes*, 363 S.W.3d 71 (Mo. App. W.D. 2011) (en banc).

question by applying the same standard of review to the arbitrator's decision which the Prosecuting Attorney and County Executive were contractually obligated to apply. Thus, the question we must answer is whether "the findings of fact and decision of the arbitrator are clearly contrary to the weight of the evidence, viewed in its entirety, together with the legitimate inferences which may be reasonably drawn from the evidence and in the light most favorable to the findings of fact and the decision of the arbitrator."

*Int'l Ass'n of Firefighters, Local Union No. 42 v. Jackson Cnty.*, No. WD79785, 524 S.W.3d 217, 223–24, 2017 WL 3253042, at *5 (filed Aug. 1, 2017) (the "*Mitchell* decision").

## Discussion

█ We reviewed the relevant provisions of the parties' collective bargaining agreement in the *Mitchell* decision. 524 S.W.3d at 223–25, 2017 WL 3253042, at *5-*6. In summary, the collective bargaining agreement states the parties' joint commitment to "advancing and practicing the highest of ethical standards as embodied by the Rules of Professional Conduct adopted by the profession." The agreement gives the Prosecutor the authority to hire and fire assistant prosecutors, including engaging in "[d]iscipline and discharge for just cause." The agreement provides that discipline will be imposed "pursuant to a system of progressive discipline," and is subject to review through the grievance procedure, which culminates in arbitration proceedings. The results of any arbitration are subject to joint review by the Prosecutor and County Executive, under the standards quoted above.

Like in the *Mitchell* case, "the parties dispute whether the arbitrator appropriately cited to federal caselaw, and private-sector labor arbitration decisions, to give meaning to the collective bargaining agreement's 'just cause' standard." 524 S.W.3d at 225, 2017 WL 3253042, at *6. As in *Mitchell*, "[i]t is unnecessary for this court to resolve those issues, however, because even under the arbitrator's reading of the 'just cause' standard, progressive discipline and prior warnings are not required before discharging an employee, if the conduct is as severe and egregious as [Krantz's] conduct in this case." *Id.*

█ The *Mitchell* decision emphasized that, even under the labor-arbitration principles applied by the arbitrator, progressive discipline and prior notice are not required where an employee engages in severe or egregious misconduct whose wrongfulness should be self-evident. 524 S.W.3d at 225–26, 2017 WL 3253042, at *7. Making knowingly false statements to a court constitutes the sort of egregious misconduct which can justify summary termination without resort to progressive discipline or prior notice. As we explained in the *Mitchell* decision:

The fact that [lying] to the court [is] egregious, and clearly wrong, should literally "go without saying." It is a bedrock principle of attorney ethics that lawyers must be truthful to the court. Rule 4-3.3(a)(1) of the Rules of Professional Conduct unambiguously provides that "[a] lawyer shall not knowingly … make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer." Making knowing, affirmative false statements to a court is among the most serious acts of professional misconduct an attorney can commit. As the Missouri Supreme Court has only recently reiterated, "[g]enerally, 'when an attorney, with an intent to deceive the court, submits a false document, makes a false

statement, or withholds material information, disbarment is the appropriate sanction.'"

The obligation to be forthcoming and candid with the court is heightened for prosecutors, who wield enormous power over the life and liberty of other persons.

524 S.W.3d at 226–27, 2017 WL 3253042, at *8 (other citations omitted).

In this case, the arbitrator found that Krantz made untruthful statements to the court, "under the legal concept of notice-knowledge," when "he told the judge that he did not have the Peters's [*sic*] letter." According to the arbitrator, the untruthfulness of Krantz's statements was established by the fact that he "had [the Discovery Letter] in his file" (contrary to Krantz's denials in his arbitration testimony), and had authorized his second-chair Ledom to respond to the letter and to seek a continuance of a hearing date because of the need to respond. The arbitration decision states that Krantz's denials of receipt of the Discovery Letter, and his claimed ignorance of his obligation to respond, were "belied"—meaning, "cannot be believed"—in light of the continuance application Krantz authorized Ledom to file. (The continuance application explicitly refers to the Discovery Letter, and requests additional time to respond to the Letter.)

In his arbitration testimony, Krantz claimed that his statements during the July 19 hearing were merely intended to convey that "I don't have the letter here," and that "I didn't have it in front of me." By finding that Krantz (mis)represented to the court that he had not *received* the Discovery Letter, the arbitrator rejected Krantz's careful parsing of his statements.

We recognize that the arbitration decision states that "the County failed to prove that Krantz ... did not forget that he received the Peters letter and what it was

about before being questioned about it." While it may have been the arbitrator's role to weigh the evidence, this statement does not absolve Krantz from discharge. First, the arbitrator's statement refers to Krantz's forgetfulness "*before* being questioned about" the Discovery Letter. Whether or not Krantz had forgotten about the letter *before* being asked about it is not the determinative issue, however. Instead, the issue is whether Krantz remembered receiving the letter *during* (and after) the extended discussion of the letter at the July 19 hearing. Krantz admitted at the arbitration hearing that looking at the continuance application "kind of jogged my memory a little bit" concerning his receipt and handling of the Discovery Letter. Krantz was provided with a copy of the continuance application at the July 19 hearing. The arbitration decision makes no finding as to when Krantz's recollection was refreshed, by review of the continuance application or otherwise.

Second, the arbitration decision ignores the fact that the allegation of misconduct against Krantz was not limited to what occurred at the July 19 hearing itself. The Notice of Discharge also refers to Krantz's "fail[ure] to correct" the statements he made at the hearing. Rule 4-3.3(a)(1) of the Rules of Professional Conduct prohibits a lawyer from "knowingly ... fail[ing] to correct a false statement of material fact or law previously made to the tribunal by the lawyer." This obligation continues until the relevant proceeding concludes by entry of final judgment. *See* Rule 4-3.3, Comment [13]. In this case, Krantz undoubtedly became aware of the falsity of the claim he made at the hearing—that he had never received the Discovery Letter—either during the hearing itself, or in its immediate aftermath (which involved not only Judge Grate's written Ruling on Motions, but also the launching of an internal investiga-

tion within the Prosecutor's Office). The arbitration decision fails to address the fact that Krantz's discharge was justified based on his knowing failure to correct false statements of material fact he made during the July 19 hearing.

Finally, the arbitration decision ignores the fact that a lawyer's ethical obligations extend beyond simply avoiding knowingly false statements. The official commentary to Rule 4-3.3 states that

> [A]n assertion purporting to be on the lawyer's own knowledge, as in an affidavit by the lawyer or in a statement in open court, may properly be made only when the lawyer knows the assertion is true or believes it to be true on the basis of a reasonably diligent inquiry.

At a minimum, Krantz acted improperly by making factual statements at the July 19 hearing based on no preparation or inquiry. Krantz candidly acknowledged at the arbitration hearing that he was "basically flying by the seat of [his] pants" during the July 19 hearing, and had done *no* meaningful preparation concerning the discovery issues which arose during the hearing. The arbitrator found that "Krantz did not advise the court that he was unprepared, as he should have, because he believed that he c[ould] get through the conference on the basis of his ample experience." A lawyer as unprepared as Krantz, however, cannot properly make factual representations to the court, when he has no good-faith basis for making them.

Ultimately, the arbitrator concluded that Krantz's dishonesty could not justify his dismissal because of the "no discipline, 'anything goes' atmosphere" which purportedly prevailed in the Prosecutor's Office prior to Peters Baker's appointment. As discussed above, and in the *Mitchell* decision, Krantz's violation of his obligation of candor to the tribunal, as stated in Rule 4-3.3, is the sort of egregious misconduct which justified his dismissal, without regard to the concepts of progressive discipline, or prior warnings or notice.

Krantz's misrepresentations to the circuit court, standing alone, justify his discharge. We also note, however, that the arbitration decision is flawed when it concludes that Krantz's discovery violations could not justify discharge. On appeal, Local 42 does not contest the conclusions in the Modification decision that Krantz willfully violated the court's March 24, 2011 order, and that he failed to comply with his discovery obligations under Rule 25.03 in the *Lopez* case, as well as in other cases. Instead, Local 42 relies on the arbitrator's conclusion that Krantz could not be discharged based on this misconduct, without express notice that actions like his would no longer be tolerated.

The "lack of notice" argument ignores that, whether or not the *entire office* had been advised of Peters Baker's disciplinary approach, Krantz was specifically notified that *his* failure to adequately respond to discovery would not be tolerated. As Dickinson testified, Krantz had been placed on a written Work Improvement Plan in 2008 for "discovery problems, not responding to discovery, not working his cases." Therefore, whether or not *other* prosecutors were aware that repeated and willful discovery violations could be a basis for discipline or discharge, *Krantz* was specifically advised of his own deficiencies in this regard, and of the need to improve his conduct with respect to discovery (on pain of more severe discipline). Whether or not other prosecutors could credibly argue a lack of notice, Krantz's notice argument is defeated by the Work Improvement Plan to which he was subject in 2008.

\* \* \* \* \*

Krantz's lack of candor to the court at the July 19, 2011 hearing, and his failure to correct his factual misstatements, violated fundamental standards of professional attorney conduct. This behavior was the type of severe misconduct for which progressive discipline and prior notice were unnecessary, under the arbitrator's own analysis. In addition, whether or not other attorneys had been adequately advised that repeated and willful discovery violations could result in discipline, Krantz had been personally admonished that his conduct in discovery was unacceptable, and required improvement. The history of prior attorney discipline—or lack of discipline—in the Prosecutor's Office to which the arbitrator referred was insufficient to absolve Krantz of responsibility for his misconduct, or immunize him from the appropriate consequences for that misconduct.

The arbitrator's conclusion that Krantz's immediate discharge was unwarranted was "clearly contrary to the weight of the evidence, viewed in its entirety." The Prosecuting Attorney and County Executive acted within their authority under Article VI, § 3(C) of the collective bargaining agreement in modifying the arbitrator's decision, and reinstating Krantz's discharge.

### Conclusion

The judgment of the circuit court is affirmed.

All concur.